900 F.2d 251
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SUSAN S. GILPIN; THOMAS H. GILPIN; ANN S. BUNCH; JAMES N.
BUNCH; H.G. SHAFFER, III, Plaintiffs-Appellees,
v.
APPALACHIAN POWER COMPANY, a Virginia Corporation,
Defendant-Appellant.
 No. 89-2057.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 30, 1989.
Decided: April 11, 1990.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Charles H. Haden, II, Chief District Judge. (CA-87-1467-2)
 Mark A. Swartz, Love, Wise & Woodroe, Charleston, W. V. (ARGUED) for appellant; on brief.
 Timothy R. Conaway, Madison, W.V., for appellees.
 John O. Kizer, Love, Wise & Woodroe, Charleston, W.V., on brief.
 S.D.W.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Appalachian Power Company (Appalachian) appeals from the district court's order reforming a right of way contract which it had entered into with the surface owners of a tract of land in Boone County, West Virginia. Appalachian argues that there was neither mutual mistake nor clear and convincing evidence of such.[1] We affirm.
 
 
 2
 Susan S. Gilpin, Ann S. Bunch, H.G. Shaffer III, and their spouses (the Shaffers) are the surface owners of a tract of land in Boone County, West Virginia. In 1977, the Shaffers entered into a lease with Ashland Land and Development Company (Ashland), granting it the right to use the surface of the land to surface mine the underlying coal. Ashland agreed to pay the Shaffers a royalty equalling 2% of the gross sale price of the coal mined from the property.
 
 
 3
 Sometime later, Appalachian approached Harry G. Shaffer, Jr., the surface landowners' father and attorney, concerning obtaining a right of way over the tract. Appalachian's agents for the transaction, Roscoe H. Thomas, Jr. and Keith S. Lazenby, have no recollection of the negotiations or the eventual transaction. Harry Shaffer, Jr. testified that during the negotiations, the parties were concerned with the eventuality that the power lines would sterilize coal, resulting in a loss of royalties to Shaffer's children. As a result, Shaffer testified, the parties agreed to include language which required Appalachian to either move the power lines to allow for the mining or pay for the loss of the royalties. Although the first agreement between the parties included no such provision, Shaffer's children signed the agreement. Harry Shaffer, Jr. then realized that the agreement failed to protect his children's royalty interest and sent Appalachian a letter on November 6, 1978, which in relevant part said:
 
 
 4
 You will recall that in dealing with me for the benefit of my children on your right of way across their land, that I expressed concern that your right of way not deprive my children of any royalties to which they might be entitled as a result of the mining of the coal, and you assured me this would be taken into consideration. However, in the agreement they signed there was no such provision ... I respectfully request that in fairness to my children, this right of way agreement with them should be amended.
 
 
 5
 In response to Shaffer's letter, Appalachian drafted a second agreement which included a paragraph regarding sterilized coal. The paragraph, however, required that the grantors own the coal being mined in order to be paid for any royalties lost as a result of the right of way. Since Shaffer's children owned only the surface, the inserted paragraph was meaningless to them. Shaffer's children signed the second agreement.
 
 
 6
 Mining has occurred on the Shaffer tract and Appalachian's power lines have sterilized a certain tonnage of the coal. The Shaffers sued seeking to have the district court reform the agreement on the basis of mutual mistake to include a clause requiring Appalachian to pay the Shaffers for their lost royalties. The district court found that the paragraph regarding sterilized coal was entered into by mutual mistake and reformed the contract.
 
 
 7
 As stated, Appalachian appeals arguing that there was neither mutual mistake nor clear and convincing evidence[2] thereof. We disagree. Harry Shaffer Jr.'s uncontradicted[3] testimony is that the parties agreed during the negotiations to include a clause to protect his children's royalty interest. Shaffer's testimony is corroborated by the contemporaneous letter written to Appalachian. Additionally, the fact that Appalachian responded to Shaffer's letter by replacing the first agreement with an agreement that included a clause dealing with sterilization is strong support for the Shaffers' position that Appalachian had agreed to protect their royalty interest. We see no error in the district court's decision that there was mutual mistake and that such evidence constitutes clear and convincing evidence thereof.
 
 
 8
 The judgment of the district court is accordingly
 
 
 9
 AFFIRMED.
 
 
 
 [1]
 The case was decided on cross motions for summary judgment, to which procedure objection is not made on appeal
 
 
 [2]
 The district court followed the standard in West Virginia to reform a contract for mutual mistake found in Melott v. West, 86 S.E. 759, 762 (W.Va.1915)
 
 
 [3]
 Appalachian provides no evidence which directly contradicts Shaffer's testimony. It does argue, however, that it would not have agreed to pay the royalties in question because in doing so it would have paid more than 100% for the coal in place. We are not persuaded by the argument because the 2% royalty involved was not for the coal in place but for a lease to consume the surface while surface mining the coal. The placement of Appalachian's towers deprived the mineral owners of the profits they would have earned mining the coal and the surface owners of the 2% royalty they were entitled to under their earlier lease with Ashland. On the other side of the coin, it is highly unlikely that the Shaffers would have given up what has been stipulated to be $66,000 in royalties for the $12,000 in consideration which Appalachian paid for the right of way